This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
On June 9, 1998, the Summit County Court of Common Pleas issued a judgment against Appellant, JoAnn Cunningham ("Mrs. Cunningham"), and in favor of Appellees, James D. Conrad, Administrator, of the Workers' Compensation Bureau, and the City of Cuyahoga Falls (collectively "Workers' Comp."). The trial court ruled that Mrs. Cunningham was not entitled to participate in the Workers' Compensation Fund. Mrs. Cunningham has appealed from this judgment.
 I
Mrs. Cunningham has assigned as error that the trial court's decision to deny death benefits is against the manifest weight of the evidence, in light of the presumption contained in R.C.4123.68(W) and the testimony that her deceased husband had an eighteen year history of employment related smoke inhalation. We overrule her assignment of error because even assuming, arguendo, that Mr. Cunningham's coronary artery disease was caused or induced by the cumulative inhalation of smoke, it was not against the manifest weight of the evidence for the trial court to find that the affirmative evidence of long term smoking refuted the presumption that the causative exposure was work related.
 II
Wayne Cunningham ("Mr. Cunningham"), the deceased husband of Mrs. Cunningham, worked as a firefighter in Cuyahoga Falls from 1966 until 1984. During that time Mr. Cunningham worked both as a firefighter and as an Emergency Medical Technician. No direct evidence was presented with respect to the extent of Mr. Cunningham's job related inhalation exposure to smoke or other toxins.[1] One co-worker testified that the three fire stations in Cuyahoga Falls handled approximately six hundred fires a year. Each firefighter was on call for twenty-four hours and off for forty-eight hours. From 1966 until approximately 1972, firefighters used relatively ineffective filter devices during the "knock down"[2] phase of the fire, then generally removed them for the remainder of the fire. From 1972 on, more effective self-contained breathing units were available, but were generally used in the same manner as the filter devices. These practices led to the inhalation of smoke and other toxins virtually every time a firefighter was involved in extinguishing a fire, with somewhat less exposure in the later years than in the earlier ones.
Mr. Cunningham smoked from approximately 1960 through his death in 1992. Testimony indicated that he smoked at least one and a quarter packs a day, and perhaps as many as four packs a day through his first heart attack in 1984. None of the medical reports submitted as evidence and none of the medical deposition testimony indicated that he had high blood pressure, was overweight, or had elevated cholesterol levels at the time of his 1984 heart attack. Contradictory medical reports noted both that he had a family history of heart disease, and that he did not. Only one expert testified as to the meaning of family history, with respect to risk of heart disease. That expert indicated that a positive family history for heart disease meant relatives of the first degree with heart disease. Mr. Cunningham's mother was alive at the time of his death, and free of heart disease. His father died in his mid seventies of cancer, and there was uncontradicted testimony that he did not have coronary artery disease. Mr. Cunningham had no siblings.
After Mr. Cunningham's heart attack in 1984, testimony and medical reports indicated that he cut down on his smoking, and at times may have stopped completely. His wife testified that he attempted to quit smoking, with only moderate success, several times after his first heart attack. From 1986 until his death in 1992, periodic medical reports indicated Mr. Cunningham had high cholesterol, triglycerides, and blood pressure and that he was, for part of that time, on blood pressure medication. During this time his weight ranged from one hundred eighty-two to two hundred twenty-one. Generally, it was around two hundred.
Two experts testified via deposition. Dr. R. Michael Kelly testified for Mrs. Cunningham. Dr. Kelly is board certified in internal medicine and was, at one time, the clinical director of the Greater Cincinnati Occupational Health Center. His current patient population includes a number of firefighters, some of whom have cardiovascular disease. Dr. Kelly was asked whether "the cumulative effect of the inhalation of smoke, toxic gasses, chemical fumes and other toxic substances, was a direct and proximate cause of the arteriosclerotic cardiovascular disease which caused" his death. He was asked to base his opinion on all of the information he had reviewed, and on the assumption that Mr. Cunningham had been involved in fighting approximately one hundred structural fires a year. He responded, "I don't think there's any question that the firefighting experiences of Mr. Cunningham were a significant cause of his cardiovascular disease and his death." He explained the causative connection between Mr. Cunningham's coronary artery disease and his work-related exposure primarily in terms of a reduction of blood oxygen levels due to the inhalation of carbon monoxide. He also added that changes in vascular pressure due to inhalation of other toxins contributed to the risk. Finally, he offered the general assertion that epidemiological studies indicate that firefighters are at increased risk. He also noted that the risk would be particularly high for a long-term firefighter during the years in which Mr. Cunningham worked because of the inadequate protective gear available and the prevailing practices regarding its use. He also noted that "cigarettes, and to a lesser degree, the cholesterol and lipid values" were factors. He agreed, on further questioning, that the carbon monoxide inhalation associated with smoking might be the factor that increased the risk of cardiovascular disease in smokers.
Dr. Richard A. Katzman testified for Workers' Comp. Dr. Katzman is board certified in internal medicine and specializes in internal medicine and cardiology. Eighty percent of his practice from 1962 through 1997 was cardiology. At the time of his deposition he had recently begun a new position as a staff physician in cardiology at a different hospital, where he devotes twenty percent of his time to the sub-specialty of cardiopulmonary disability. Dr. Katzman testified, based on his review of Mr. Cunningham's extensive medical records, that "there is no indication that his death was caused, aggravated or accelerated by his work as a fire fighter." He elaborated that Mr. Cunningham had the multiple risk factors of smoking, high blood pressure, family history, and obesity. He also noted that there was "no evidence" that Mr. Cunningham "suffered any unusual injury during the course of his work and there were certainly no unusual fume exposures that are recorded here[.]" He also testified that recent studies indicate that, absent unusual exposure, firefighters are at no greater risk for coronary artery disease than individuals who have similar lifestyles but for the occupational exposure to smoke. He specifically cited a study that compared the incidence of coronary artery disease in firefighters to that found in police officers. It concluded that, while firefighters are at higher risk for "lung problems and respiratory problems," the "current findings do not appear to demonstrate increased risk of [cardiovascular disease] in firefighters."
Both experts testified that smoking, high cholesterol, hypertension, gender, family history, and weight were general risk factors for coronary artery disease. Both experts testified that Mr. Cunningham was specifically at risk for coronary artery disease because of smoking, high cholesterol, hypertension, and his gender.
 III
Mrs. Cunningham has asserted that the trial court judgment is against the manifest weight of the evidence. The Ohio Supreme Court has noted that "the discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment]." State v.Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. In determining whether this is one of those exceptional cases, we review the entire record, consider the credibility of the witnesses, weigh all the evidence, and make all reasonable inferences. Angus v. Ventura (January 27, 1999), Medina App. No. 2740-M, unreported at 5. To sustain Mrs. Cunningham's assignment of error this court must find that, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Id.
The judgment is not a manifest miscarriage of justice if "there is a real conflict in the evidence in the sense that reasonable men might honestly vary in their conclusions as to whether, on the whole record, the judgment rendered below is or is not supported by the evidence." Swartz v. Wells (1982), 5 Ohio App.3d 1, 5.
Ohio has designated a number of diseases as occupational diseases, which are compensable as such when they are contracted in the course of employment through the specific processes designated by statute. R.C. 4123.68. Cardiovascular disease is a recognized occupational disease for firefighters repeatedly exposed to heat, smoke, chemical fumes, and other toxic substances. R.C. 4123.68(W). Determination that the cardiovascular disease of a specific firefighter was contracted in the course of employment is a two-part process. See id. First, the firefighter must establish that the disease was "caused or induced by" the cumulative exposure to the toxins designated by statute. Id. Once the firefighter has shown causation, a refutable presumption arises that such exposure, and the resulting disease, occurred "in the course of and arising out of his employment."[3] Id.
In the case below, the trial court held that, "[t]here is a lack of evidence presented * * * that would support this claim that there were these toxic inhalations contributing to the coronary heart disease as a cause of death." We understand this to mean that the trial judge determined that Mr. Cunningham's coronary artery disease was not caused by toxic exposure on the job. Under the statute, the judge could have found this one of two ways. He could have found that Mr. Cunningham's coronary artery disease was not caused by the cumulative effect of exposure to smoke and other toxins. In the alternative, he could have found that the coronary artery disease was caused by such exposure, but that affirmative evidence refuted the presumption that such exposure occurred in the course of and arising out of his employment.
The court was presented with uncontradicted evidence that, at the time he suffered his final heart attack, Mr. Cunningham was at risk for coronary artery disease because he was male, had high cholesterol, hypertension, and a significant smoking history. In addition, one expert testified that Mr. Cunningham's obesity[4] and his family history were also factors. Both experts testified that his smoking history was a significant factor in contracting coronary artery disease. The evidence regarding his exposure to smoke and other toxins at work was more speculative. Based on the testimony of Mr. Cunningham's co-worker, and the number of shifts and stations in Cuyahoga Falls, a reasonable inference from the evidence is that Mr. Cunningham was involved in fighting between fifty and one hundred fires a year.[5] The experts disagreed with respect to whether the job related smoke inhalation was a factor in his coronary artery disease.
The decision from the trial court did not articulate whether it determined initially that Mr. Cunningham's illness was not caused by the cumulative effects of smoke inhalation, or whether it determined that such exposure did cause the disease but that affirmative evidence refuted the presumption that the exposure was job related. Viewing the record in its entirety, including the existence of other non-exposure related risk factors and the disagreement between the experts, reasonable people could honestly reach different conclusions as to whether the evidence supported a finding that Mr. Cunningham's cardiovascular disease was caused by cumulative exposure to toxins. Because of this, it was not a manifest miscarriage of justice for the court to determine that cumulative effects of inhalation of smoke and other toxins did not cause his cardiovascular disease, whether that exposure occurred on the job or elsewhere.
In the alternative, it would also have been reasonable for the court to determine that inhalation of smoke was the primary cause of his coronary artery disease. Assuming, arguendo, that it was caused by the inhalation of smoke, we reach the presumption that the causative exposure to smoke occurred on the job as opposed to elsewhere. There was significant affirmative evidence that the smoke that caused or induced Mr. Cunningham's coronary artery disease did not occur on the job. There was testimony that Mr. Cunningham smoked up to three or four packs a day from as early as 1960 through his first heart attack in 1984. Some testimony was presented that he quit smoking after that heart attack. The testimony of his wife, who was most likely to have observed him on a daily basis, was that he did not go back to three to four packs a day but that his attempts to quit were not entirely successful. Dr. Kelly explained the causal connection between firefighting and cardiovascular disease primarily in terms of the carbon monoxide exposure, which he admitted also occurred in cigarette smoking. Although Dr. Kelly treats some patients with cardiovascular disease, his specialty is internal medicine. Dr. Katzman testified that although cardiovascular disease might be caused by unusual exposures to toxic inhalations by firefighters, he could find no evidence of such exposure in Mr. Cunningham's experience. Dr. Katzman is a long-term specialist in cardiovascular disease, with a subspecialty in cardiovascular disability. Neither physician had met Mr. Cunningham.
Reviewing the evidence, and making reasonable inferences therefrom, Mr. Cunningham was exposed to non-occupational smoke inhalation by smoking up to eighty cigarettes a day for twenty-four years, and up to twenty a day for the next eight years. He was exposed to occupational smoke, and other toxins that routinely occur while fighting a fire, every three to six days for eighteen years. Taking into account the cardiac specialist's opinion of the relative dangers of each type of smoke inhalation to which Mr. Cunningham was exposed, and the relative extent and duration of each exposure, the court could reasonably have believed that the affirmative evidence of non-occupational exposure refuted the presumption that the causative exposure was occupational.
Mrs. Cunningham's assignment of error is overruled.
 IV
Because the decision of the trial court, that job related toxic inhalants did not cause his coronary artery disease, is not contrary to the manifest weight of the evidence, Mrs. Cunningham's assignment of error is overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
FOR THE COURT
SLABY, P. J.
QUILLIN, J.
CONCUR
(Quillin, J., retired Judge of the Ninth District Court of Appeals, sitting by assignment pursuant to Section 6(C), Article IV, Constitution.)
[1] There is direct evidence, from injury reports, that Mr. Cunningham was involved in fighting at least five fires and was exposed to ammonia in another incident.
[2] A fire was described by Myron Harrington, a former captain of the Cuyahoga Falls Fire Department, as knocked down when "[y]ou have the flame extinguished and you can see in the building and you have to go in and finish up the hot spots and clear the building and debris or whatever has to be done in there."
[3] The statute provides, in relevant part:
 Any cardiovascular * * * disease of a fire fighter * * * caused or induced by the cumulative effect of exposure to heat, the inhalation of smoke, toxic gases, chemical fumes, and other toxic substances in the performance of his duty constitutes a presumption, which may be refuted by affirmative evidence, that such occurred in the course of and arising out of his employment.
(Emphasis added.) R.C. 4123.68. The presumption which arises is not that all cardiovascular disease in firefighters is caused by or arises out of their work, but that if it is shown that cardiovascular disease in an individual is caused by cumulative exposure to things which firefighters normally encounter in their line of work that the causative exposure occurred at work, rather than elsewhere.
The phrase "in the performance of his duty" must be read as modifying only "other toxic substances," because to read it as modifying the entire list would render completely redundant the presumption that the exposure or causation occurred at work. Under the canons of statutory construction, a statute is to be read in a way that gives meaning to each word or phrase, rather than making some of them redundant. See East Ohio Gas Co. v. Pub.Util. Comm. (1988), 39 Ohio St.3d 295, 299.
[4] Mr. Cunningham weighed, at most, two hundred and twenty one pounds and was six feet tall. The medical records submitted to court indicate that his weight ranged between one hundred eighty-two and two hundred twenty-one. Most of the time his weight was between one hundred ninety-five and two hundred four. None of the individuals who actually saw Mr. Cunningham described him as overweight.
[5] Myron Harrington, a former captain in the Cuyahoga Falls Fire Department, estimated that there were approximately six hundred fires per year that were handled by three fire stations. The crew at each station was divided into three shifts. Six hundred fires, spread over nine station-shifts comes to approximately sixty-seven fires per shift at each station. Deducting "off days, vacation and holidays and that nature" would make the number somewhat less; accounting for the fires to which more than one station responded would increase the number somewhat. Harrington's estimate of one hundred fires a year per firefighter did not explicitly take into account the existence of the three stations in Cuyahoga Falls. He accounted for working only every third day by using a base number of two hundred fires per work year per firefighter. He then deducted fifty per cent for "off days, vacation and holidays and that nature." His estimate is probably high because it assumes, by ignoring the fact that there are three stations, that all three stations responded to each fire. Testimony contradicted this assumption.